IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| MARTIN ZISHOLTZ on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>SUNTRUST BANKS, INC., et al.<br><br>  Defendants. | CIVIL ACTION FILE<br>NO. 1:08-CV-1287-TWT |

ORDER

This is a securities fraud class action. It is before the Court on the Plaintiffs' Motion to Initiate Limited Discovery [Doc. 34], the Defendants' Motion to Dismiss the Amended Complaint [Doc. 37], and the Defendants' Motion to Dismiss the Second Amended Complaint [Doc. 46]. For the reasons set forth below, the Defendants' Motions are GRANTED, and the Plaintiffs' Motion is DENIED.

I. Background

This case arises out of the collapse of the market for auction rate securities. Auction rate securities are debt or equity instruments with variable short-term rates and long-term maturities. They are bought and sold at auctions held at intervals of seven to thirty-five days. If successful, each auction resets the rate until the next

auction and provides holders with short term liquidity. The purported advantage of auction rate securities was that investors got short term liquidity with rates higher than most other short term investments, while issuers got long term financing with rates lower and more flexible than most other long term financing.

Auction rate securities are sold using modified Dutch auctions. Each share is sold at a par value of $25,000. Potential investors submit buy bids that provide how many shares and at what minimum rate the investor is willing to purchase. Current holders can submit hold bids that provide the holder will continue to hold a certain quantity of shares no matter what the rate. They can submit hold-at-rate bids that provide the holder will hold a certain quantity of shares unless the rate falls below a certain number. Or, they can submit sell bids that provide the holder will sell a certain quantity at any rate. These bids are submitted by brokers to an auction agent. The auction agent then determines if the auction succeeds or fails. An auction succeeds if the buy bids exceed or equal the sell bids. If the auction succeeds, the clearing rate is the new rate that applies until the next auction. The clearing rate is the lowest rate at which all of the securities available for sale are purchased by potential investors or held by current holders. An auction fails if the number of sell bids exceeds the number of buy bids or if all current holders submit hold bids. If the number of sell bids exceeds the number of buy bids, then current holders continue holding and the

rate that applies is a pre-determined maximum rate. The maximum rate is usually an above market rate designed to compensate current holders and increase the chances for the next auction to succeed. If all current holders submit hold bids, then current holders continue holding and the rate that applies is a pre-determined all hold rate. The all hold rate is usually a below market rate designed to compensate issuers and increase the chances for the next auction to succeed.

The market for auction rate securities was very substantial. From 1984 to 2006, the market for auction rate securities had grown to more than $200 billion, and the fees collected by the financial institutions involved in this market was more than $600 million per year. But a number of problems began to emerge beginning in 2006. On May 31, 2006, the Securities and Exchange Commission (SEC) instituted administrative proceedings against fifteen financial companies, including SunTrust Capital Markets, Inc.[1] (Second Am. Compl. ¶ 61.) The SEC found that each of these companies engaged in one or more manipulative auction practices designed to prevent auction failures, favor certain investors over others, and maintain certain clearing rates. These practices included changing investors' bids without consent, submitting bids from their own accounts, rearranging bid priorities, submitting bids after

---

[1] SunTrust Capital Markets, Inc. was the predecessor to SunTrust Robinson Humphrey, Inc., a Defendant in this case.

deadlines, asking customers to submit certain bids and then compensating them with higher rates in secondary markets, and providing different estimates of rates to certain investors. The SEC fined these companies a total of $13 million and ordered them to cease manipulative auction practices in the future.

In 2007, the demand for auction rate securities began to weaken. In March 2007, the Financial Accounting Standards Board decided that auction rate securities should be listed on balance sheets as short term investments instead of cash equivalents. (Id. ¶ 90.) In response, many corporations began selling their auction rate securities so that their balance sheets would not show a reduction in cash. To make up for reduced demand, financial companies bought more auction rate securities for their own accounts. But, throughout 2007, the international financial crisis made it increasingly difficult for financial companies to maintain large holdings of auction rate securities. Indeed, several auctions failed in August 2007, although these failures were not widely reported. (Id. ¶ 99.) By 2008, the international financial crisis continued, and financial companies could no longer support the auction rate securities market. In a matter of a few days in February 2008, the entire market for auction rate securities collapsed at once. On February 13, 2008, 87% of auctions failed, leaving investors without any options for short term liquidity. (Id. ¶ 102.) Investors either

had to hold onto their securities for the duration of the maturity period, which was often thirty years, or sell them at a significant discount to par value.

In this case, the Plaintiffs Martin Zisholtz and Michael Maguire purchased auction rate securities based on statements made to them by the Defendants SunTrust Banks, Inc., and its wholly owned subsidiary SunTrust Robinson Humphrey, Inc. The Plaintiffs say that the Defendants falsely told them that they owned "7 day paper, money market account" and "would have complete liquidity in 7 days, low risk/low yield."  The Plaintiffs say that the Defendants failed to disclose that auction rate securities are not cash equivalents, lack features to ensure the holder can liquidate if auctions fail, and had been artificially inflated and supported by manipulative auction practices.  (Id. ¶¶ 111, 122.)  The Plaintiffs also say that the Defendants engaged in a variety of manipulative auction practices designed to defraud investors.  (Id. ¶¶ 72-73.)  Based on these allegations, the Plaintiffs filed this case on behalf of themselves and all other investors who purchased auction rate securities from the Defendants from April 1, 2003 through February 13, 2008.  The Plaintiffs assert various claims under the Securities Exchange Act of 1934.  The Defendants now move to dismiss all of the Plaintiffs' claims for failure to state a claim upon which relief can be granted. The Plaintiffs also seek to initiate limited discovery of documents that the Defendants have already produced to the SEC and any other government securities regulators.

## II.  Motion to Dismiss Standard

A complaint must be dismissed if, even accepting all well pleaded factual allegations as true, it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Complaints that allege fraud under federal securities law must satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act of 1995.  A complaint "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud."  In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).  A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U. S. C. § 78u-4(b)(2). A strong inference is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

## III. Discussion

Section 10(b) of the Securities Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>     . . . .
> (b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. SEC Rule 10b-5 implements section 10(b). It provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. There is an implied private right of action against any person who violates section 10(b). Tellabs, 551 U.S. at 318. There is also a private right of action against any control person. 15 U.S.C. § 78t(a). A control person is any person "who, directly or indirectly, controls any person liable under any provision of [the Securities Exchange Act] or of any rule or regulation thereunder . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act

or acts constituting the violation or cause of action." Id. Pursuant to these statutory provisions and regulations, the Plaintiffs assert three different types of claims: claims for violations of Rule 10b-5(b), claims for violations of Rule 10b-5(a) and (c), and claims for control person liability.

    A.    SEC Rule 10b-5(b)

Rule 10b-5(b) prohibits the making of a false statement or omission of a material fact in connection with a securities transaction. 17 C.F.R. § 240.10b-5(b). To state a claim for a violation of Rule 10b-5(b), a plaintiff must allege that the defendant made the false statement or omission with an intent to defraud or with severe recklessness. McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989). Severe recklessness is defined as:

> [H]ighly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. Because a corporation does not have its own state of mind, the state of mind of its agents must be imputed to the corporation. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008). A court should "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or

approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." Id.

The Plaintiffs say that the Defendants made false statements and omissions of material facts. They offer the experience of Plaintiff Michael Maguire as an example. Maguire says that he purchased shares of Nuveen Insured Municipality Fund based on statements made by Brooke West, his SunTrust broker. Maguire says that West told him that he "would have complete liquidity in 7 days, low risk/low yield," and that he "owned 7 day paper, money market account." (Second Am. Compl. ¶ 122.) The Plaintiffs say that these statements are false statements of material facts. Maguire also says that West never talked to him about the auction process, but instead emailed him a brochure about the Nuveen fund.[2] The brochure states that investors, at any time, can "offer their shares for sale at the next weekly auction," and that "[t]o date, no Nuveen MuniPreferred auction has ever been postponed." The brochure does, however, also state that "Nuveen MuniPreferred provides (but does not guarantee) liquidity at par through weekly auctions." (Id. ¶¶ 121-22.) The Plaintiffs say that the statements in the brochure are misleading because neither West nor the brochure disclosed that shares of the Nuveen fund are not cash equivalents, lack features to

---

[2]The Plaintiffs provide excerpts, but not the full copy, of the brochure in their Second Amended Complaint.

ensure the holder can liquidate if auctions fail, and had been artificially inflated and supported by manipulative auction practices. The Plaintiffs' Amended Complaint is largely an indictment of auction rate securities brokers as a group.

The Plaintiffs say that the Defendants made these false statements and omissions with an intent to defraud or with severe recklessness. The Plaintiffs do not focus on the state of mind of Brooke West or any other individual SunTrust broker. Instead, the Plaintiffs focus on what they say was the state of mind of the corporate official or officials at SunTrust who allegedly ordered, approved, or furnished information for the false statements and omissions. The Plaintiffs say that these unnamed high level corporate officials issued management directives and uniform sales materials to their employees, which intentionally or recklessly misrepresented the nature of auction rate securities, and which employees then passed on to customers.

The Plaintiffs allege a number of circumstantial facts to support their theory. First, the Plaintiffs say that different SunTrust brokers each made similar false statements and omissions to their clients. They say that the best explanation for "company-wide [false statements] and omissions is that . . . management issued a directive or recklessly provided misleading information to SunTrust employees." (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl., at

15.) Second, the Plaintiffs say Defendants were among the companies investigated by the SEC in 2006 for manipulative auction practices. They say that, because of this investigation, high level corporate officials must have been aware of manipulative auction practices. Third, citing statements from two confidential witnesses, the Plaintiffs say that there was minimal training on how to sell auction rate securities.[3] They say that "minimal training is consistent with . . . management simply instructing its brokers that [auction rate securities] were liquid cash equivalents." (Id., at 18.)

The Plaintiffs' allegations about the Defendants' state of mind do not meet the heightened pleading requirements applicable to securities fraud cases. As an initial matter, their allegations are not stated with particularity. 15 U. S. C. § 78u-4(b)(2); see Williams v. WMX Techs., 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity."). The Plaintiffs say that high level corporate officials issued management directives and uniform sales materials, but the Plaintiffs do not identify any of these officials by name, by title, or even by job description. Instead, the Plaintiffs repeatedly and vaguely refer to "management." See Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (particularity "means the who, what, when, where, and how: the first paragraph

---

[3] Confidential Witness 1 was a relationship manager, and Confidential Witness 2 was a vice president and senior supervisory specialist. (Second Am. Compl. ¶¶ 169-170.)

of any newspaper story"). The Plaintiffs say that there were "uniform sales materials and top-down management directives," but the Plaintiffs do not describe what these documents may have said, who issued them, or when they were distributed. (Second Am. Compl. ¶ 108.) The Plaintiffs say that there was minimal training on how to sell auction rate securities, but, again, the Plaintiffs do not describe what was said at any training sessions, who conducted them, or when they were conducted. Instead, the Plaintiffs' allegations simply state that "training at SunTrust was 'abysmal'" and "training was just done over a conference call 'and that was it.'" (Second Am. Compl. ¶ 171.)

The Plaintiffs' allegations also do not give rise to a strong inference that the Defendants acted with an intent to defraud or with severe recklessness. The Plaintiffs' theory is that high level corporate officials issued management directives and uniform sales materials to their employees, which intentionally or recklessly misrepresented the nature of auction rate securities, and which employees then passed on to customers. This theory, while possible, is not strongly supported by the Plaintiffs' allegations. Neither of the Plaintiffs' confidential witnesses mention any management directives or uniform sales materials. If high level corporate officials had, in fact, issued management directives or uniform sales materials, then the confidential witnesses would have probably mentioned it and the Plaintiffs would have included

it in their allegations. See Mizzaro, 544 F.3d at 1250 ("Simply put, if . . . officials at 'corporate headquarters' orchestrated the fraud, CW1 would have known this and said so explicitly, but he never said that."). Indeed, none of the Plaintiffs' allegations mention a single communication from any high level corporate officials, let alone any management directives or uniform sales materials. Id. ("The absence of these types of allegations weighs strongly against the inference that . . . [high level] officials orchestrated the fraud.").

The more plausible theory is that high level corporate officials carelessly or negligently provided training on how to sell auction rate securities, and because of improper training, many SunTrust brokers exaggerated the benefits and downplayed the risks of auction rate securities. Instead of discussing management directives or uniform sales materials, the Plaintiffs' confidential witnesses say that training was "abysmal" and "just done over a conference call." (Second Am. Compl. ¶ 171.) This description is more consistent with a negligent state of mind than a fraudulent or reckless one. The only allegation that might suggest otherwise is the allegation that the Defendants were among the companies investigated by the SEC in 2006 for manipulative auction practices. The Plaintiffs say that, because of this investigation, high level corporate officials at SunTrust must have been aware of manipulative auction practices. But the inference that the Plaintiffs ask the Court to draw is simply

too weak and convoluted. It requires the Court to assume that the Defendants continued manipulative auction practices after the SEC investigation, that the same corporate officials that were providing training on how to sell auction rate securities also knew that the manipulative auction practices were continuing,[4] and that those corporate officials intentionally or recklessly failed to disclose the manipulative auction practices to SunTrust brokers, who in turn failed to disclose them to customers. While this inference is possible, the Plaintiffs do not provide sufficient allegations to make it anything more than a weak and convoluted inference. Therefore, the Defendants are entitled to dismissal of the Plaintiffs' claims for violations of Rule 10b-5(b).

  B. <u>SEC Rule 10b-5(a) and (c)</u>

Rule 10b-5(a) prohibits "any device, scheme or artifice to defraud." 17 C.F.R. § 240.10b-5(a). Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. The Plaintiffs say that subsections (a) and (c) are flexible, catch-all provisions that prohibit any type of manipulative practice designed to defraud investors. See <u>In re ZZZZ Best Sec. Litig.</u>, 864 F. Supp. 960, 971 (C.D. Cal. 1994)

---

[4] It is not enough "that one corporate officer makes a false statement that another officer knows to be false." <u>In re Apple Computer, Inc.</u>, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).

("[T]he scope of deceptive devices or schemes prohibited by subsections (a) and (c) is quite extensive."). But see Ross v. Bank South, N.A., 885 F.2d 723, 729 (11th Cir. 1989) ("[T]he fraud must be so pervasive that it goes to the very existence of the bonds and the validity of their presence on the market.").

The Plaintiffs say that the Defendants violated subsections (a) and (c) by engaging in a variety of manipulative auction practices designed to defraud investors. They say that the Defendants were among the companies investigated by the SEC in 2006 for manipulative auction practices, and that the SEC found that each of these companies engaged in one or more manipulative auction practices. These practices included changing investors' bids without consent, submitting bids from their own accounts, rearranging bid priorities, submitting bids after deadlines, asking customers to submit certain bids and then compensating them with higher rates in secondary markets, and providing different estimates of rates to certain investors. The Plaintiffs also say that, "throughout the Class Period, SunTrust either intervened in the auctions by placing support bids to purchase [auction rate securities] for its own account, or knowingly acquiesced in the fraudulent auction 'support' by other brokerage firms." (Id. ¶ 73.)

The Plaintiffs' allegations about manipulative auction practices do not meet the heightened pleading requirements applicable to securities fraud cases. Their

allegations are not stated with particularity. Fed. R. Civ. P. 9(b). Despite describing the manipulative auction practices themselves in sufficient detail, the Plaintiffs never clearly say which of the manipulative practices the Defendants are accused of. They simply list the manipulative auction practices and then say that the Defendants engaged in one or more of those practices or that the Defendants engaged in a "wide range of deceptive and manipulative tactics." (Second Am. Compl. ¶ 72.) The most specific allegation that the Plaintiffs make is that, "throughout the Class Period, SunTrust either intervened in the auctions by placing support bids to purchase [auction rate securities] for its own account, or knowingly acquiesced in the fraudulent 'support' by other brokerage firms." (Id. ¶ 73) (emphasis added). But even this allegation is deficient. Although they seem to narrow it down to two practices, they still do not say which of the two practices the Defendants engaged in. The Plaintiffs also do not describe which of the many different types of auction rate securities the Defendants purchased, when they purchased them, or how they "acquiesced" in the fraudulent support by other brokerage firms. See Garfield, 466 F.3d at 1262 (particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story"). This information is relevant because the Defendants are not in all cases liable for simply purchasing auction rate securities. Cf. Silverman v. Bear, Stearns & Co., 331 F. Supp. 1334, 1337 (E.D. Pa. 1971) ("[T]here is no recognized

duty on a broker's part to disclose to its customers that it is purchasing the same securities for its own accounts as it is for their accounts."). Nor are they liable for acquiescing in support of the auction rate securities market by other brokerage firms. See Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 177 (1994) (rejecting liability for "giving aid to a person who commits a manipulative or deceptive act"). Therefore, the Defendants are entitled to dismissal of the Plaintiffs' claims for violations of Rule 10b-5(a) and (c).

### C. Control Person Liability

There is a private right of action against any control person. 15 U.S.C. § 78t(a). A control person is any person "who, directly or indirectly, controls any person liable under any provision of [the Securities Exchange Act] or of any rule or regulation thereunder . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Id. Because there is no underlying liability against either of the Defendants, the Defendants are entitled to dismissal of the Plaintiffs' claims for control person liability. See Garfield, 466 F.3d at 1261 ("[T]he success of [the plaintiff's] section 20(a) claim turns on the resolution of its claims under Section 10(b) and Rule 10b-5.").

D.  Leave to Amend

At the very end of the Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss the Second Amended Complaint, the Plaintiffs say that, "[i]n the event Defendants' motion is granted, Plaintiffs respectfully seek leave to replead." This is not a proper request for leave to amend. "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." Posner v. Essex Ins. Co., 178 F.3d 1209, 1222 (11th Cir. 1999). Moreover, the Plaintiffs have not said "how or in what manner they would amend the Complaint or what allegations would be added or deleted if allowed to do so." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 384 (5th Cir. 2004). Nor have the Plaintiffs "suggested they have relevant information they were unaware of when the Complaint" was filed. Id. The Plaintiffs have already been given two opportunities to amend their Complaint. They are not entitled to a third. Therefore, the Plaintiffs are not entitled to leave to amend their Complaint.

E.  Discovery

The Private Securities Litigation Reform Act of 1995 imposes a stay on "all discovery and other proceedings . . . during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is

necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(b). The Plaintiffs have moved to lift this stay on discovery and initiate limited discovery of any documents that the Defendants have already produced to the SEC and any other government securities regulators. The Plaintiffs have not met their heavy burden of showing undue prejudice or the likelihood that the Defendants will not preserve relevant evidence. See 15 U.S.C. § 78u-4(b)(3)(B). Moreover, the "failure to muster facts sufficient to meet the [heightened] pleading requirements [does not] constitute the requisite 'undue prejudice' to the plaintiff justifying a lift of the discovery stay." See SG Cowen Sec. Corp. v. United States Dist. Court for the N. Dist. of Cal., 189 F.3d 909, 913 (9th Cir. 1999). Therefore, the Plaintiffs are not entitled to a lifting of the stay on discovery.

## IV. Conclusion

For the reasons set forth above, the Defendants' Motion to Dismiss the Amended Complaint [Doc. 37] and Motion to Dismiss the Second Amended Complaint [Doc. 46] are GRANTED, and the Plaintiffs' Motion to Initiate Limited Discovery [Doc. 34] is DENIED.

SO ORDERED, this 24 day of September, 2009.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge